## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-----------------------------------------------------x
                            :

In re:                       :    Chapter 11
                            :

SCH Corp., et al.,[1]      :    Case No. 09-10198 (BLS)
                            :

              Debtors.   :    (Jointly Administered)
                            :

-----------------------------------------------------x

## DECLARATION OF MICHAEL L. WILHELMS,
## CHIEF FINANCIAL OFFICER OF THE DEBTORS,
## IN SUPPORT OF FIRST DAY MOTIONS

I, Michael L. Wilhelms, hereby declare that the following is true to the best of my knowledge, information and belief:

1.    I am the Chief Financial Officer of American Corrective Counseling Services, Inc. ("American Counseling"). I have been the Chief Financial Officer of American Counseling since November 3, 2008.[2] The two other above-captioned debtors in this case

2.    My current duties for American Counseling include general supervision of, and responsibility for, American Counseling's business and financial affairs and activities and reviewing, formulating and assisting with American Counseling's business plans and strategies. Under the direction of American Counseling's Chief Executive Officer, I am authorized to make decisions with respect to the operation of American Counseling's business including

---

[1] The Debtors in these cases, along with each Debtor's federal tax identification number, are: SCH Corp. (20-1829454); American Corrective Counseling Services, Inc. (33-0656885); and ACCS Corp. (20-1829485). For purposes of these chapter 11 cases, the address for all Debtors is: 180 Avenida LaPata, San Clemente, CA 92673.

[2] SCH Corp. and ACCS Corp. are the other debtors in the above-captioned cases (collectively, with American Counseling, the "Debtors"). SCH Corp. and ACCS Corp. are holding companies with no operations. I am familiar with the business and financial affairs of all of the Debtors.

organization, human resources, logistics, finance, and administration.. In my capacities with the American Counseling, I have general knowledge of the books and records of the Debtors, and am familiar with the Debtors' financial and operational affairs.

3.    I submit this Declaration in support of the "first day" motions of the Debtors (described further below and which are referred to collectively herein as the "First Day Motions"). Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge, my review of the Debtors' books and records, relevant documents and other information prepared, collected or provided by the Debtors' employees, or my opinion based on my experience with the Debtors' operations and financial conditions. If I were called to testify as a witness in this matter, I could and would competently testify to each of the facts set forth herein based upon my personal knowledge, review of documents or information, or opinion. I am authorized to submit this Declaration on behalf of the Debtors.

4.    Based on my personal knowledge, and through my review of the Debtor's books, records and other information, I believe that the relief sought by the Debtors in the First Day Motions is necessary to enable the Debtors to continue to operate as debtors in possession during the course of their respective bankruptcy cases.

5.    Part I of this Declaration describes the business of the Debtors and the developments that led to the filing of their chapter 11 petitions. Part II sets forth the relevant facts in support of the First Day Motions. Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the First Day Motions.

## PART I

### Overview of Debtors' Businesses

6.      The Debtors' principal business activity consists of providing educational seminars and administrative support services in connection with bad check diversion programs (the "Diversion Programs") adopted by state and local prosecutors' offices.  The Diversion Programs typically allow individuals who have issued dishonored or "bad" checks (the "Participants") to avoid the prospect of criminal prosecution provided the Participant makes restitution to the victim of the bad check and attends an educational seminar.  The Diversion Program seminars are designed to eliminate or modify many of the behavioral rationalizations surrounding the writing of bad checks and focus on deficiencies in the areas of personal finance, communication, and stress management.  Each Participant must pay a fee for the seminar and make full restitution to the victim of the bad check.

7.      In the course of their business, the Debtors have contracted with hundreds of state and local prosecutors' offices throughout the country to conduct seminars and provide administrative support in connection with the Diversion Programs adopted by such offices (the "Support Agreements").

8.      Under the Support Agreements, the Debtors, among other things, (i) provide qualified instructors to conduct Diversion Program seminars, (ii) provide their proprietary seminar materials developed by the Debtors in conducting these seminars and for distribution to Participants, (iii) lease the facilities used to conduct the seminars at various locations within the jurisdiction of the applicable prosecutors' office, (iv) monitor attendance of

#10466542 v1

the seminars, and (v) communicate directly with Participants regarding scheduling, attendance, and related administrative details.

         9.    The Support Agreements also require the Debtors to provide assistance in developing administrative procedures to be followed with respect to the clerical and accounting functions of the applicable Diversion Program.  Such procedures include, among other things: (i) maintaining thorough records to enable the generation of reports detailing the compliance and the disposition status of each Participant; (ii) maintaining a detailed current accounting record of all receipts and disbursements of the applicable Diversion Program; (iii) opening and sorting correspondence related to the Diversion Program; (iv) preparing monthly reports providing a summary of transactions and Diversion Program activity for the period; (v) maintaining physical files, computer files, and facilities required for performance under the agreements; (vi) depositing restitution payments and Diversion Program Fees in a federally insured account opened by the Debtors; and (vii) disbursing, on behalf of the applicable prosecutors' office, restitution payments owing to the victims of the bad checks.  In addition, under the Support Agreements, the Debtors typically are required to implement and perform these functions.

         10.    The Debtors' primary compensation for their services stems from the fees paid by Participants to enroll in the Debtors' seminars.  In essence, when a Participant opts to enter into the Diversion Program in lieu of risking criminal prosecution and other penalties, the Debtors and each Participant enter into an implied contractual relationship under which the Debtors are required to provide educational services in exchange for the payment of a program fee.

## Overview of Debtors' Capital Structure and Outstanding Indebtedness

11.    The Debtors' business is conducted through American Counseling. American Counseling was formed on December 21, 1994 as a California corporation. American Counseling is wholly-owned by ACCS Corp., a Delaware Corporation ("ACCS"). ACCS, in turn, is wholly owned by SCH Corp., a Delaware Corporation ("SCH").

12.    Prior to November 10, 2004, all of the issued and outstanding stock of American Counseling was owned by (i) Donald Mealing, individually, (ii) Donald Mealing, as trustee of the Mealing Family Trust u/t/d 8/23/95 (collectively, "Mealing"), and (iii) Lynn Hasney ("Hasney"). Additionally, Nicholas Wallner ("Wallner", and together with Mealing and Hasney, the "Owners") held an option to purchase 30% of American Counseling's outstanding stock from Mealing and Hasney (such option, together with the outstanding stock of Target held by Mealing and Hasney, the "Securities"). Also at this time, certain of the assets (the "Assets") necessary to conduct American Counseling's business were owned by Fulfillment Unlimited, Inc., ACCS Administration, Inc. and Fundamental Performance Strategies (collectively, the "Selling Companies", and together with the Owners, the "Selling Parties").

13.    On September 21, 2004, the Selling Parties and Equity Pacific Advisors, LLC ("EPA") entered into a Stock, Options and Asset Purchase Agreement (the "Old Acquisition Agreement"), pursuant to which EPA agreed to purchase all of the Securities from the Owners, and to purchase the Assets from the Selling Companies. EPA subsequently established Debtor SCH and Debtor ACCS (collectively, the "Buyers") to carry out EPA's obligations under the Old Acquisition Agreement. On November 10, 2004, the Selling Parties

and the Buyers entered into an Amended and Restated Stock, Options and Asset Purchase

Agreement (the "New Acquisition Agreement"), which is governed by California law.

      14.     The consideration paid by the Buyers to the Owners and the Selling

Companies under the New Acquisition Agreement was as follows:

- To the Owners:

     a.     $25,212,667 in immediately due and payable demand notes were

issued by ACCS;

     b.     $2,500,000 in subordinated promissory notes were issued by SCH

(the "Seller Notes").

     c.     10,000 shares of Series B Common Stock of SCH were issued to

the Owners, as follows: (i) 6,000 shares to Mealing, (ii) 1,000 shares to Hasney and (iii) 3,000

shares to Wallner.

     d.     $1,350,000 was paid into escrow in consideration for Owners non-

compete agreements and to serve as a holdback for potential claims by Buyers against Owners

for indemnification under the New Acquisition Agreement.

- To the Selling Companies:

     a.     $812,333 in cash.

      15.     The New Acquisition Agreement contains a standard indemnification

obligation for breaches by the Owners.  In addition, the Owners were required to indemnify the

Buyers against all losses incurred by them in connection with certain covered litigation

("Covered Litigation Losses").   The Owners' indemnification obligations with respect to

Covered Litigation Losses were subject to a $125,000 basket and a diminishing cap (the "Cap")

that started at $5,000,000. When the Buyers subsequently made a claim against the Owners for

Covered Litigation Losses (i.e., when Buyers' insurance coverage for Covered Litigation Losses

expired), the Cap was approximately $2,500,000, or the amount of the Seller Notes. It is the

Debtors' belief that the Cap has been exhausted by a reduction to zero, or the amount of the

Seller Notes, which, based on the Debtors' understanding, are no longer outstanding, and the

Owners' indemnification obligations have been completely fulfilled. Pursuant to release

agreements entered into between Owners and Buyers, the indemnification obligations have now

shifted such that ACCS and SCH, as Buyers, are responsible for indemnifying the Owners for

their Covered Litigation Losses to the extent not covered by insurance.[3]

   16. In order to consummate its acquisition of American Counseling, Buyers

obtained financing from Levine Leichtman Capital Partners III, L.P. ("LLCP"), and Buyers,

American Counseling and LLCP entered into a Securities Purchase Agreement, dated as of

November 10, 2004 (as amended from time to time, the "SPA" ). The SPA is governed by

California law. Pursuant to the SPA, LLCP provided Buyers (i.e., ACCS and SCH) with

$27,900,000, and in exchange received the following securities[4]:

- Secured Senior Term A Discount Note Due 2009 in the aggregate
  principal face amount of $21,949,091, issued by ACCS (as amended from
  time to time, the "Term A Note")

- Secured Senior Term B Discount Note Due 2009 in the aggregate
  principal face amount of $5,487,273, issued by ACCS (as amended from

---

[3] Defenses to any such indemnification obligations may exist and nothing herein is intended to waive any defenses
or validate any claims for indemnity.
[4] LLCP subsequently sold a 3.5842% participation interest in the following securities to Paul J. Isaac.

time to time, the "Term B Note", and together with the Term A Note, the "Original Notes").

- Warrant to purchase 35,000 shares of Series A Common Stock of SCH, exercisable until November 10, 2014 (the "LLCP Warrant"); and

- 30,000 Series A Preferred Shares of SCH (including all shares issued as PIK dividends in respect thereof, the "Preferred Shares").

17.     The annual interest rate on the Original Notes, which is payable monthly in arrears, is (i) 16.33% until April 1, 2007, (ii) 14.333% until April 29, 2008 and (iii) 15.833% thereafter (subject, in each case, to increase in the event of default).  A portion of the interest is payable in kind as follows: (i) up to 3% until October 31, 2006, (ii) up to 2% from November 1, 2006 until the Libra Fee (defined below) is fully paid, and (iii) up to 1.5% thereafter.   The Original Notes mature on October 31, 2009 and contain acceleration provisions in the event of default.

18.     The LLCP Warrant gave LLCP the right to put the warrant (and/or any shares issued pursuant thereto) to ACCS under certain circumstances (including on the maturity date of the Notes). The Preferred Shares are now owned by ACCS, which purchased them from LLCP on January 9, 2008, in consideration for $2,000,000 in cash and a Secured Senior Term C Note in the aggregate principal face amount of $2,808,029.42 (the "Term C Note").  The Term C Note bears interest as follows: (i) 14.333% until April 28, 2008, (ii) 15.833% from April 29, 2008 until December 31, 2008 and (iii) assuming no refinancing has occurred by December 31, 2008, 14.333% thereafter.  Otherwise, the Term C Note has substantially the same terms as the Original Notes.

#10466542 v1

19.     The obligations of ACCS and SCH , to LLCP in their capacity as Buyers under the SPA and related documents are secured throughout the Debtors' ownership structure, including as follows:

- General and continuing guaranties (the "Guarantees") were entered into by each of SCH (a downstream guaranty) and American Counseling (an upstream guaranty) in favor of LLCP, guaranteeing all of the obligations (including payment of loans and indebtedness) of ACCS and American Counseling (as applicable) under the SPA and related documents.

- Security agreements (the "Security Agreements") were entered into by each of SCH, ACCS, and American Counseling, securing their obligations to LLCP under the SPA and related documents.  These Security Agreements granted LLCP a security interest in certain of the assets of SCH, ACCS, and American Counseling (including, accounts, equipment, inventory and general intangibles).

- Pledge agreements (the "Pledge Agreements") were entered into by each of SCH, ACCS, Libra (as defined below), and EPA, pursuant to which all of the stock of each of American Counseling and ACCS, and all of the stock of SCH held by EPA and Libra, was pledged to LLCP (as is all other stock held by EPA or the Buyers in any other person).

- Security interest in certain intellectual property were entered into by each of SCH, ACCS, and American Counseling in favor of LLCP.

- Deposit account control agreements were entered into by each of SCH, ACCS, and American Counseling, granting LLCP control over their respective accounts at Union Bank of California.

20.    For the transactions described above, EPA hired Libra Securities, LLC ("Libra"). As compensation for its services, Libra was issued a warrant to purchase 10,150 shares of Series B Common Stock of SCH, exercisable until November 10, 2014. The warrant, which has since been assigned to Libra FE, LP, gave Libra the right to put the warrant (and/or any shares issued pursuant thereto) to SCH under certain circumstances. SCH's obligations to Libra have been subordinated to SCH's obligations to LLCP pursuant to a Subordination Agreement dated as of November 10, 2004.   Libra has entered into a pledge agreement in favor of LLCP, pledging its rights in the warrant to secure the Buyer's obligations under the SPA and related documents.

21.    On October 31, 2005, LLCP made a $700,000 bridge loan to ACCS and received a 16.333% Secured Senior Bridge Note. The bridge loan matured on July 31, 2006 and has since been repaid in full. Also on October 31, 2005, ACCS issued 7% Unsecured Subordinated Promissory Notes to three of its executives and SCH issued a similar note to one of its executives (who are all employees of EPA) in the aggregate amount of approximately $28,500, in satisfaction of the fee for their services for October 2005. Each of ACCS and SCH was entitled to issue similar notes (collectively with the October notes, the "Management Notes") to these executives for the pay periods ending on November 2, 2005, January 11, 2006, February 8, 2006 and March 10, 2006.   The Management Notes were subordinated to the 16.333% Secured Senior Bridge Note and the other obligations of ACCS to LLCP.

22.    The current ownership structure of SCH as a result of the transactions described above as well as the outstanding amounts due to LLCP as of December 31, 2008 are reflected in the following tables:

<u>Current Ownership</u>

| Name | Type of Security Owned | Number of Shares Held | Ownership Percentage (Fully Diluted) |
|------|------------------------|------------------------|--------------------------------------|
| Equity Pacific Advisors, LLC | Series A Common Stock | 44,850 | 41.26% |
| Levine Leichtman Capital Partners III, L.P. | Warrant to purchase Series A Common Stock | 35,000 (assumes full exercise of warrant) | 32.20% |
| Libra FE, LP | Warrant to Purchase Series B Common Stock | 10,150 (assumes full exercise of warrant) | 9.34% |
| Employee Stock Option Pool | Series B Common Stock | 8,700 | 8.00% |
| Mealing | Series B Common Stock | 6,000 | 5.52% |
| Wallner | Series B Common Stock | 3,000 | 2.76% |
| Hasney | Series B Common Stock | 1,000 | 0.92% |

<u>Current Debt Outstanding to LLCP</u>

| Type of Obligation | Approximate Amount Outstanding at 12/31/08[5] |
|--------------------|------------------------------------------------|
| Secured Senior Term Notes[6] | $32,132,008.08 |

---

[5] All debt amounts stated herein are subject to reconciliation.

[6] This total represents the amount claimed to be owed by LLCP, which total the Debtors dispute. As noted above the maker of the Secured Senior Term Notes are ACCS, The Secured Senior Term Notes are guaranteed by SCH

| Legal Fees and Expenses[7] | $71,505.47 |
|---|---|
| Total | $32,203,513.55 |

## Events Leading to the Chapter 11 Filings

23.     Although the Debtors believe that their businesses are fundamentally

sound and healthy, unresolved litigation, certain defaults under the SPA, and actions taken by

LLCP have led the Debtors to file these chapter 11 cases.

## A.     Class Action Litigation

24.     The Debtors are defendants in various federal class action suits (the "Class

Actions") which are summarized below.  The Class Actions relate, in part, to how business was

conducted by the Selling Parties before the Buyers acquired the business and made operational

changes to it.  The Debtors believe that the Class Actions have no merit, but the expense of

defending this litigation has financially drained the Debtors.

25.     In Del Campo v. American Corrective Counseling Services, Case No. 01-

21151-JW (N.D. Cal.), plaintiffs allege that the Diversion Programs operated by the Debtors for

various California District Attorneys violate the Fair Debt Collection Practices Act (the

"FDCPA"), 15 U.S.C. §1692 et seq., as well as California's unfair trade practices act.  Plaintiffs

---

and American Counseling.  Nothing herein is intended to validate the debt owing under the Secured Senior Term
Notes or the perfection of any alleged security interests with respect thereto, and the Debtors reserve all rights,
claims, and objections to the debt, any alleged security, and as against LLCP.
[7] Incurred by LLCP in enforcing its rights under the SPA and related documents, and payable by American pursuant
to Section 8.6 of the SPA.  This amount is as of November 30, 2008.  The Debtors reserve the right to contest the
reasonableness of these fees.

contend that the Debtors unlawfully mail "collection letters" on district attorneys' letterhead and falsely threaten check writers with criminal prosecution unless the check writers pay certain fees and attend a financial accountability class.  ACCS contends that the Diversion Programs are law enforcement programs wherein the local prosecutor offers bad check offenders the opportunity to be diverted from criminal prosecution and, therefore, that the programs are not governed by or subject to the FDCPA.  In December 2008, the court certified a class of approximately 900,000 California residents who were contacted by the Debtors in connection with Diversion Programs.

      26.    In Rosario v. American Corrective Counseling Services, Case No. 2:01-CV-221-FtM-29DNF, (M.D. Florida), plaintiffs allege that the Diversion Programs operated by the Debtors for various Florida District Attorneys violate the FDCPA, as well as Florida's consumer collection practices act.  Plaintiffs contend that the Debtors unlawfully mail "collection letters" on the district attorneys' letterhead and falsely threaten check writers with criminal prosecution unless the check writers pay certain fees and attend a financial accountability class. The Debtors contend that the bad check diversion programs are law enforcement programs wherein the local prosecutor offers bad check offenders the opportunity to be diverted from criminal prosecution and, therefore, that the programs are not governed by or subject to the FDCPA.

      27.    Cross-motions for summary judgment were filed in early 2008 and are scheduled to be heard on January 20, 2009.  The district court also indicated that it intends to hold a pretrial conference that same day, and set a tentative trial date of March 2, 2009.  Class certification was briefed in November 2005 but has never been decided, and it is unclear whether the district court will require the parties to supplement the class certification briefing.

28.    In <u>Hamilton v. American Corrective Counseling Services</u>, Case No. 3:05-CV-434 (N.D. Indiana), plaintiffs allege that the Diversion Programs operated by the Debtors for various Indiana District Attorneys violate the FDCPA, as well as Indiana common law. Plaintiffs contend that the Debtors unlawfully mail "collection letters" on district attorneys' letterhead and falsely threatens check writers with criminal prosecution unless the check writers pay certain fees and attend a financial accountability class. The Debtors contend that the Diversion Programs are law enforcement programs wherein the local prosecutor offers bad check offenders the opportunity to be diverted from criminal prosecution and, therefore, that the programs are not governed by or subject to the FDCPA.

29.    In 2007, the district court certified a class of approximately 40,000 Indiana residents who were contacted by the Debtors in connection with Diversion Programs. Cross-motions for summary judgment have been fully briefed and pending before the court for over a year.

30.    In <u>Cataquet v. American Corrective Counseling Services</u>, Case No. 3:08-CV-1175 (M.D. Penn.), plaintiffs allege that the Diversion Programs operated by the Debtors for various Pennsylvania District Attorneys violate the FDCPA, as well as Pennsylvania's unfair trade practices act. Plaintiffs contend that the Debtors unlawfully mail "collection letters" on district attorneys' letterhead and falsely threaten check writers with criminal prosecution unless the check writers pay certain fees and attend a financial accountability class. The Debtors contend that the Diversion Programs are law enforcement programs wherein the local prosecutor offers bad check offenders the opportunity to be diverted from criminal prosecution and, therefore, that the programs are not governed by or subject to the FDCPA.

31.     The case is in the early pleadings stage, and an initial case management conference with the district court is scheduled for January 27, 2009.

**B.      Declarations of Default under SPA and Other Actions of LLCP**

32.     On August 12, 2008, September 2, 2008, October 22, 2008, November 3, 2008, December 2, 2008, and January 5, 2009, LLCP informed the Debtors in writing that the Debtors were in default under the SPA (the "Default Notices"). The Default Notices related to, inter alia, alleged violations of the "Minimum EBITDA" and "Minimum Fixed Charge Coverage Ratio" covenants contained in the SPA. On January 12, 2009, LLCP provided the Debtors with an additional default notice and demanded the immediate payment in full of $32,203.513.55 under the SPA. Also on January 12, 2009, LLCP provided the Debtors with written notice of its intent to foreclose on the stock of American Counseling pledged as collateral in connection with the SPA (the "Pledged Stock") on January 19, 2009 (the "Foreclosure Notice").

33.     Prior to sending the Foreclosure Notice, LLCP informed that Debtors that unless the Debtors voluntarily sought bankruptcy protection by January 19, 2009, LLCP would accelerate the indebtedness under the SPA and foreclose on the Pledged Stock. During these communications, LLCP cited its increasing concerns with the Debtors' potential liability with respect to the Class Actions. Specifically, LLCP expressed its unwillingness to risk an adverse ruling being entered against the Debtors at a Class Action summary judgment hearing scheduled on January 20, 2009. Although the Debtors vigorously attempted to reach a resolution with LLCP and to address their concerns, LLCP refused to rescind the Foreclosure Notice. Faced with an impending foreclosure of the Pledged Stock and an attendant loss of control of their businesses, the Debtors filed these cases.

## PART II

### First Day Motions

34.     In connection with the filing of theses cases, the Debtors have requested

certain relief through the First Day Motions.  The relevant facts in support of the First Day

Motions follow below.

### Employee Motion

35.     The Debtors have filed a motion for entry of an order, pursuant to

Bankruptcy Code sections 105(a), 363, and 507(a), authorizing the Debtors to: (i) pay prepetition

wages, salaries, commissions, employee benefits and other compensation; (ii) remit withholding

obligations; (iii) maintain employee benefits programs and pay related administrative

obligations; and (iv) authorize the Debtors' banks and other financial institutions to receive,

process, honor and pay certain checks presented for payment and to honor certain fund transfer

requests related to the foregoing (the "Employee Motion").

**A.**     **Wages, Salaries and Other Compensation**

36.     In the ordinary course of their businesses, the Debtors incur payroll and

various other obligations and provide other benefits to their employees for the performance of

services.  The Debtors currently employ approximately 292 full-time and part-time employees in

hourly, salaried, exempt, non-exempt, supervisory, management and administrative positions to

perform the functions necessary to effectively and efficiently operate the Debtors' business.  Of

these employees, approximately 57 are salaried employees and approximately 235 are hourly

employees.  The Debtors also currently utilize approximately 2 temporary employees (together

with the hourly and salaried employees, collectively, the "Employees").[8]  American Corrective

Counseling Services, Inc. ("American Counseling") is the Debtor entity which employs the

Employees.

37.     In addition, American Counseling's Chairman, Chief Executive Officer,

and Chief Operating Officer, are employed by non-Debtor Equity Pacific Advisors, LLC

("EPA") (collectively the "EPA Employees").  The Debtors pay EPA a monthly management fee

(the "Management Fee"), equaling the aggregate amount of the monthly wages paid to the

foregoing employees of EPA and EPA, in turn, uses the Management Fee to pay the monthly

wages of the EPA Employees.  The Debtors also utilize the services of an independent contractor

to provide accounting services (the "Independent Contractor") to whom the Debtors pay weekly

wages (the "Independent Contractor Wages").

38.     The Debtors have costs and obligations in respect of the Employees, the

EPA Employees, and the Independent Contractor relating to the period prior to the Petition Date.

In certain instances, these costs and obligations are outstanding and due and payable, and in

other instances these costs and obligations will become due and payable in the ordinary course of

the Debtors' businesses on and after the Petition Date.

39.     American Counseling pays the Employees on a bi-weekly basis, one week

in arrears. The bi-weekly payroll for all Employees (other than temporary employees who are

provided by temporary agencies) is approximately $237,585.42.  American Counseling funds

---

[8] Temporary employees are provided through one or more temporary agencies.  The applicable Debtor pays the
applicable agency who, in turn, pays the temporary employee provided by such agency.  As indicated, for purposes
of this Motion, temporary employees are included within the definition of "Employees."  Consequently, the Debtors
seek authority to pay the temporary agencies for work done by the temporary employees prior to the Petition Date.

approximately 70% of its Employee payroll obligations on the Thursday immediately preceding

the Friday on which Employees are paid.  Approximately 25% of the payroll obligations

(pertaining to payroll taxes) are funded on the Friday on which Employees are paid.  The

remaining 5% of the Debtors' Employee payroll obligations  (pertaining to the withholdings for

the Debtors' 401(k) plan) are funded on the Monday following the Friday on which Employees

are paid.

        40.      The Debtors pay their part-time and full-time Employees on either an

hourly wage or salaried basis.  Hourly employees (other than temporary employees) are paid on a

bi-weekly basis, one week in arrears.  American Counseling's average bi-weekly gross payroll

for all of its hourly employees is approximately $106,238.60 (the "Hourly Wages").  Hourly

employees were last compensated on January 9, 2009 (the "Last Pay Date") for the pay period

beginning on December 21, 2008 and ended January 3, 2009.  The most recent pay period for all

hourly employees terminated on January 17, 2009, covering the period from January 4, 2009

through January 17, 2009, with payment scheduled for January 23, 2009.  This entire pay period

occurred before the Petition Date.  The Debtors therefore estimate that they have accrued and

unpaid Hourly Wages in respect of the period prior to the Petition Date aggregating

approximately $120,163.67 (the "Unpaid Hourly Wages").

        41.      American Counseling's average bi-weekly gross payroll for all of its

salaried employees (excluding temporary employees) is approximately $131,346.83 (the

"Salaried Wages" and, together with the Hourly Wages, the "Wages").  Salaried employees of

the Debtors are paid bi-weekly, with the most recent payment occurring on the Last Pay Date

(*i.e.* January 9, 2009) for the pay period beginning on December 21, 2008 and ended January 3,

2009. The most recent pay period for all salaried Employees terminated on January 17, 2009,

covering the period from January 4 through January 17, with payment scheduled for January 23,

2009. This entire pay period occurred before the Petition Date. American Counseling estimates

that its accrued and unpaid Salaried Wages for the period prior to the Petition Date aggregates

approximately $131,346.83 (the "Unpaid Salaried Wages" and, together with the Unpaid Hourly

Wages, the "Unpaid Wages"). This amount reflects the gross obligation and includes Trust Fund

Taxes (as such term is defined herein) that must be remitted to the applicable taxing authorities.

American Counseling seeks authority to pay the Unpaid Wages and remit Trust Fund Taxes in

the ordinary course of business.

        42.    All of American Counseling's employees are eligible to earn performance

bonuses (the "Bonuses"). Employees within the "Recovery Department," are eligible to receive

Bonuses based on, among other factors, the amount of money recovered through the bad check

diversion programs administered by the Debtors in cooperation with state and local prosecutors'

offices in the preceding year. Such Employees, however, must remain employed with the

Debtors as of January 16, 2009, to qualify for these Bonuses. Employees within the Debtors'

Sales Department are eligible to receive Bonuses based on targets related to sales growth.

Employees performing instructional services in connection with the Debtors' bad check

diversion seminars are eligible to receive Bonuses based on, among other factors, the seminar

class size and the location of seminars. Employees within the Debtors' "New Diversion"

department, which engages in product development, are eligible to receive Bonuses based on,

among things, the achievement of certain performance goals. As of the Petition Date, the

Debtors estimate that the amount of accrued but unpaid Bonuses earned during the 180 days

prior to the Petition Date aggregates approximately $30,800.  The Bonuses are due to be paid by the Debtors on January 23, 2009.

43.    As of the Petition Date, the Debtors estimate that their Unpaid Wages and Bonuses aggregate approximately $282,310.50.  No Employee has a claim for his or her Unpaid Wages and Bonus in excess of the $10,950 priority limit set forth in Bankruptcy Code section 507(a)(4).

44.    The monthly Management Fee paid to EPA on behalf of the EPA Employees totals approximately $60,800.  As of the Petition Date, the Debtors estimate that the they have no unpaid Management Fees.

45.    The weekly Independent Contractor Wages paid by the Debtor total approximately $450.  The Debtors estimate that the unpaid Independent Contractor Wages aggregate approximately $900 (the "Unpaid Independent Contractor Wages").

46.    The Debtors maintain two payroll Bank Accounts.  The only active payroll accounts for Employees is maintained at Bank of America.[9]  American Counseling issues payroll to its Employees every other Friday.  All Employees are paid through direct deposit or by paper check.  The Debtors estimate that the aggregate amount of the outstanding checks is $2,426 and that, when the amount due to any Employee for prior checks is added to the payroll that will be made on January 23, 2009, no single Employee who has an outstanding check is owed more than $10,950 for salary or wages earned prior to the Petition Date.

47.    American Counseling employs temporary employees, provided through temporary agencies, at certain of its facilities.  Generally, American Counseling receives weekly

---

[9] There is a payroll Bank Account maintained at Union Bank, but it is inactive.

invoices from the temporary agencies, and, upon receipt of payment from American Counseling, the temporary agencies in turn pay the temporary employees they provide. American Counseling believes that it is necessary to pay all obligations to the temporary agencies (the "Temporary Agency Obligations") so that these agencies will continue to provide adequate staffing for American Counseling. As stated above, American Counseling currently utilizes two temporary employees. American Counseling estimates that the total accrued and unpaid Temporary Agency Obligations as of the Petition Date aggregate approximately $11,826 (the "Unpaid Temporary Agency Obligations").

48.    American Counseling's payroll is administered by Paychex, Inc. ("Paychex"). As of the Petition Date, American Counseling does not believe it owes Paychex any unpaid fees with respect to Paychex's processing of American Counseling's payroll and administration of Withholding Obligations (defined below).

B.    **Withholding Obligations**

49.    In the ordinary course of business, American Counseling routinely withhold from Wages certain amounts that American Counseling is required to transmit to third parties for such purposes as Social Security and Medicare, federal and state or local income taxes, contributions to the Debtors' Health and Welfare Plans (defined below), 401(k) contributions, garnishment, child support, or other similar obligations pursuant to court order (collectively, the "Withholding Obligations"). Paychex administers certain Withholding Obligations for the Employees while American Counseling administers other Withholding Obligations, such as 401(k) contributions and matches and charitable contributions by Employees.

50.    Paychex provides the scheduled Withholding Obligations to American Counseling on a bi-weekly basis. American Counseling funds the Withholding Obligations (i) in part on the Thursday immediately preceding the day on which Employees are paid, (ii) in part on the Friday on which Employees are paid, and (iii) in part on the Monday following the Friday on which Employees are paid, by depositing the required funds into the payroll account. Promptly following the deposit of the Withholding Obligations, the Withholding Obligations administered by Paychex are remitted to the appropriate recipients. The Withholding Obligations to be administered by Paychex with respect to (and that are included within) the gross amount of Unpaid Wages covered by this Motion aggregate approximately $46,091.70. Separate from the Withholding Obligations administered by Paychex, the 401(k) Withholding Obligations administered by American Counseling are transferred by American Counseling to the administrator of American Counseling 401(k) plan on the Monday following each Friday on which Employees are paid.

51.    American Counseling believes that funds withheld on behalf of their Employees that remain in the Debtors' possession are not property of the Debtors' estates. Following the Petition Date, American Counseling will be holding Withholding Obligations for the benefit of its Employees. These Withholding Obligations will include, among other items, (i) approximately $9,000 in Employee 401(k) contributions (excluding matching contributions), for the January 23, 2009 payroll, and (ii) Withholding Obligations for taxes and other items described in paragraph 23 above in the estimated amount of $46,091.70, of which approximately $26,566.04 are for taxes that will be deposited with Paychex and that relate to the January 23, 2009 payroll.

## C.    **Business Expense Reimbursements**

52.    American Counseling customarily reimburses Employees who incur business expenses in the ordinary course of performing their duties on behalf of the Debtors. Such expenses typically include, but are not limited to, business-related travel expenses, including hotel and meal charges, relocation expenses, and business telephone calls (the "Reimbursement Obligations").  It is difficult for American Counseling to determine the exact amounts of Reimbursement Obligations that are due and owing for any particular time period since the expenses incurred by Employees on behalf of American Counseling throughout the year vary on a monthly basis and because there may be some delay between when an Employee incurs an expense and submits the corresponding expense report for processing.  As of the Petition Date, American Counseling estimates that it owes approximately $35,000 of Reimbursement Obligations for all Employees.

## D.    **Health and Welfare Benefits for Employees**

53.    American Counseling provides several health and welfare benefit plans (the "Health and Welfare Plans") to full-time salaried and hourly Employees (other than temporary employees).[10]

Medical, Dental and Prescription Drug Benefits

54.    American Counseling provides Employees with medical and dental benefits.  Regularly scheduled full-time Employees who have completed 90 days of continuous service with American Counseling are eligible to enroll in group health and dental coverage on a

---

[10] For purposes of the following discussion of Health and Welfare Plans, the term "Employees" excludes temporary employees.

pre-tax basis. Single and family coverage is offered by American Counseling. Coverage

becomes effective the first day of the first month following the 90 days of continuous service.

Employees are responsible for a portion of the cost of insurance, while American Counseling

pays a significant portion of the cost.

   55. Employees of American Counseling participate in a medical and

prescription drug care plan sponsored by Aetna Life Insurance Company (the "Aetna Plan"),

which is a fixed premium health plan. Each pay period, eligible Employees make contributions

for the Aetna Plan for themselves and/or their dependents. Employees incur average monthly

costs aggregating $15,000. American Counseling incurs average monthly costs of $19,560.99

per month with respect to premium payments pursuant to the Aetna Plan, which amount is paid

in advance. American Counseling is current on all payments under the Aetna Plan. American

Counseling requests authority to continue this policy in the ordinary course of business subject to

the terms thereof.

   56. American Counseling's Employees participate in a dental care plan

sponsored by Aetna Life Insurance Company (the "Dental Plan"), which is a fixed premium

plan. Each pay period, eligible Employees make contributions for the Dental Plan for

themselves and/or their dependents. Employees incur average monthly costs aggregating

$1,948.18. American Counseling incurs average monthly costs of $2,582.48 per month with

respect to premium payments pursuant to the Dental Plan, which amount is paid in advance.

American Counseling is current on all payments under the Dental Plan.

   57. Employees participate in a vision care plan sponsored by VSP (the

"Vision Plan"), which is a fixed premium plan. Each pay period, eligible Employees make

contributions for the Vision Plan for themselves and/or their dependents.  Employees incur

average monthly costs aggregating $336.58.  American Counseling incurs average monthly costs

of $446.17 per month with respect to premium payments pursuant to the Vision Plan, which

amount is paid in advance.  American Counseling is current on all payments under the Vision

Plan.

Disability, Life and Accidental Death and Dismemberment Insurance

        58.      American Counseling offers Employees life insurance ("Life Insurance")

and accidental death and dismemberment coverage ("ADD Coverage") through Aetna Life

Insurance Company ("Aetna").

        59.      Full-time Employees are eligible for Life Insurance and ADD Coverage.

American Counseling pays monthly premiums equal to $2.85 per enrolled full-time Employee in

respect of the Life Insurance and ADD Coverage.  American Counseling currently provides

approximately 117 Employees with Life Insurance and ADD Coverage.  The monthly premium

cost due to Aetna in respect of these policies is approximately $312.51 per month.  American

Counseling is current on all payments for Life Insurance and ADD Coverage.

**E.**      **Paid Time Off**

        60.      American Counseling offers paid time off ("PTO") to Employees (other

than temporary employees), consisting of, among other things, vacation time, paid holiday, sick

days and personal days.

        61.      Vacation Time.  Following 90 days of continuous service, full-time

Employees accrue paid vacation time at a rate of 4.44 hours per month for the fourth through the

twelfth month of service.  Upon completion of the first full year of continuous employment, full-

time Employees accrue paid vacation time at a rate of 6 2/3 hours per month.  Upon completion

of five full years of continuous service, full-time Employees accrue paid vacation time at a rate

of 10 hours per month.  Following 90 days of continuous service, part-time Employees who

work a minimum of 30 hours per week accrue paid vacation time at a rate of 3 1/3 hours per

month.  Certain key employees accrue vacation time at a rate of 10 hours per month regardless of

their length of service.

       62.   <u>Paid Holidays</u>.  Hourly and Salaried Employees receive ten paid holidays

per fiscal year.

       63.   <u>Choice Time</u>.  All full-time Employees are eligible for paid sick or

personal days ("Choice Time").  Full-time Employees accrue Choice Time at a rate of 3.33 hours

per month beginning on the fourth month of continuous employment.  The maximum amount of

Choice Time Employees are allowed to accrue is five days..

**F.**    **<u>401k Plan</u>**

       64.   American Counseling offers a 401(k) retirement plan (the "401(k) Plan")

to Employees.  The 401(k) Plan offered by American Counseling allows for participation by

Employees (other than temporary employees) after one hour of service.  Enrollment into the

401(k) Plan takes place on a quarterly basis.  The Debtors make matching contributions of 50%

of Employee contributions (of up to 6% of the Employees' earnings).  Employees are vested in

company matching contributions at a rate of 20% per year.

       65.   American Counseling's monthly contribution to the 401(k) Plan, including

matching contributions, is approximately $22,000, which is an average of approximately $354.84

per Employee participating in the 401(k) Plan.  The average monthly matching contribution is

$5,000. For the 2009 calendar year, American Counseling estimates that it will be required to transfer approximately $204,000 in contributions for participating Employees to the 401(k) Plan and approximately $60,000 in matching contributions made by American Counseling. American Counseling estimates that its Withholding Obligations for contributions for participating Employees are current as of the Petition Date. The estimated matching obligation as of the Petition Date is also.

### G.    Flexible Spending Accounts

66.    American Counseling offers Employees (other than temporary employees) flexible spending accounts ("FSAs") to put aside money tax-free to pay for eligible medical and dependent care costs. An eligible Employee's FSA deduction is taken out of his or her paycheck each pay period and put in an account to be used for eligible expenses through the year. The FSA program is administered by Conexis and under applicable IRS guidelines and regulations. American Counseling incurs costs of approximately $300 to $500 per month with respect to processing and administering claims with respect to the FSAs.

### H.    Workers' Compensation Insurance

67.    Under the laws of various states, American Counseling is required to maintain workers' compensation insurance to provide its Employees with coverage for claims arising from or related to their employment with the Debtors. A medical leave of absence may be granted to eligible Employees who are unable to work due to work-related disability. Payment for medical leave of absence is governed by the Employee's state of employment under that state's Workers Compensation Laws.

68.     American Counseling maintains a workers' compensation program (the "Workers' Compensation Program") with Everest Insurance Company at an annual cost of $44,836.69, which is paid in periodic installments. The Workers' Compensation Program is renewed on May 1 of each year and runs through April 30 of the following year. American Counseling estimates that as of the Petition Date, it owes $4,132.32 on account of premiums for the Workers Compensation Program (the "Unpaid Workers Compensation Premium").

### Cash Management Motion

69.     The Debtors have filed a motion for entry of an order (A) authorizing (i) the maintenance of existing bank accounts (the "Bank Accounts"), including the authority to pay routine prepetition banking fees owed to financial institutions, (ii) the continued use of existing business forms, and (iii) the continued use of the existing cash management system for the Debtors, (B) providing administrative priority to postpetition intercompany claims, and (C) waiving Bankruptcy Code section 345(b) deposit and investment guidelines (the "Cash Management Motion").

### A.    The Cash Management System

70.     The Debtors' cash management system (the "Cash Management System") is an integrated network of Bank Accounts that facilitates the timely and efficient collection, management and disbursement of funds used in the Debtors' business. Participants make restitution to the victims through the Debtors who collect and remit those payments on behalf of the victims -- in effect functioning as agent of the applicable prosecutors' office. Thus, much of the funds handled by the Debtors are in the nature of trust funds. Because of the nature of the Debtors' business and the disruption to the business that

would result if they were forced to close these accounts, it is critical that the existing Cash Management System remain in place.

71.     The Debtors maintain two types of Bank Accounts: (A) Jurisdiction Accounts (defined below) and (B) Operating Accounts (defined below).  As noted above, the Support Agreements require the Debtors to establish federally insured Bank Accounts to receive payments from Participants in the Diversion Programs (the "Participant Payments"). For each Support Agreement, the Debtors maintain a jurisdiction account within the geographical jurisdiction of the relevant prosecutors' office (the "Jurisdiction Accounts"). The Debtors receive Participant Payments from Participants on a daily basis and those payments are deposited into the Jurisdiction Accounts where they are held until disbursed in accordance with the procedures described below.  The Participant Payments are received electronically through credit cards, automatic clearing houses ("ACH"), and Western Union. The Participant Payments are also received manually via money order, cashiers check, and personal check converted into an ACH transfer.  Approximately 70% of Participant Payments are received electronically, while the remaining 30% are received manually.

72.     The Participant Payments include the following: (i) restitution payments owing to the victims of the Participants' bad checks (the "Restitution Payments"), (ii) fees for enrollment in the seminars provided by the Debtors under the Diversion Programs (the "Seminar Fees"); (iii) convenience fees charged by the Debtors for certain services (the "Convenience Fees"); and (iv) administrative fees a portion of which is owed to the applicable prosecutors' office and a portion of which is owed to the Debtors (the "Administrative Fees").

73.     The Jurisdiction Accounts and Operating Accounts are more fully described below.

**B.      Jurisdiction Accounts**

74.     As indicated on Exhibit A of the Cash Management Motion, 157 Jurisdiction Accounts are maintained with Bank of America, two are maintained with the Bank of Hawaii, and one Jurisdiction Account is maintained with each of First Commonwealth Bank, JPMorgan Chase, and Wells Fargo.

75.     Whether received electronically or manually, all Participant Payments are logged into the Debtors' proprietary bank account management system (the "Super System"). Reports generated by the Super System are utilized to manage the Jurisdiction Accounts. All electronic payments are first cleared daily through the Debtors' Bank of America Instant Payment Account (account number 000747940652), described below and transferred the same day into the appropriate Jurisdiction Account. All manual payments are deposited directly into the appropriate Jurisdiction Account.

76.     As noted above, Participant Payments include Restitution Payments owed to the Debtors, to victims of bad checks (the "Merchants"), and Administrative Fees owed to prosecutors' offices. Reports generated by the Super System indicate the amounts owed to the Debtors -- as distinct from the Merchants and prosecutors' offices -- under the Support Agreements. At least once per week, the Debtors transfer their earned portion of Participant Payments from the Jurisdiction Accounts to the Debtors' General Checking Account maintained with Bank of America (account number 00074714104), described below.

77.    Reports generated by the Super System also indicate the amount of Restitution Payments owing to Merchants.  With respect to large Merchants, the Debtors remit the Restitution  Payments owing to such Merchant's on a weekly basis.  To effect such transfers, the Restitution Payments are first transferred from the applicable Jurisdiction Account to the Debtors' Merchant account maintained with Bank of America (account number 000747561821), described below.  From this account, the Restitution Payments are then transferred to the Merchant via wire payment or manual check.  With respect to smaller Merchants, the Debtors remit the Restitution Payments on a monthly basis, usually on the fifth business day following the end of each month.  These Merchants' Restitution Payments are sent via manual check drawn directly from the applicable Jurisdiction Account.

78.    Generally, the Debtors remit payments of Administrative Fees owing to prosecutors' offices, the Debtors remit such payments on a monthly basis.[11]  All Administrative Fees owing to prosecutors' offices are paid via manual check drawn directly from the respective Jurisdiction Account.

79.    The Debtors' do not consider the Restitution Payments owing to Merchants or the Administrative Fees owing to prosecutors' offices to be the Debtors' property.  Rather, these monies are in the nature of trust funds that the Debtors hold on behalf of the Merchants and prosecutors' offices until remitted.  It is essential to the survival of the Debtors' business that the flow of funds owing to the Debtors, the Merchants, and prosecutors' offices not be interrupted.

---

[11] Certain prosecutors' offices have elected to receive their Administrative Fees less frequently while others have elected to donate their Administrative Fees to charities of their choice.  In such instances, the Debtors remit the donations directly to the respective charities.

**C.**     **Operating Accounts**

      80.    In addition to the Jurisdiction Accounts, the Debtors maintain 18 operating accounts (the "Operating Accounts"). The Operating Accounts are maintained with Bank of America and Union Bank. Although Union Bank was the Debtors' primary banking institution until 2008, the Debtors have since transferred substantially all of their operational banking activity to Bank of America. Each of the Debtors' Operating Accounts is described below.

Bank of America – General Checking (00074714104) – California

      81.    The Bank of America General Checking Account currently serves as the primary source of cash flow for the Debtor American Corrective Counseling Services, Inc. ("American Counseling"). This account serves the following functions: (i) receiving cash in-flow from the Jurisdiction Accounts; (ii) funding operations with transfers to other Bank of America accounts for items such as payroll, bank fees, and ACH payments; (iii) distributing weekly accounts payable checks; (iv) making ACH transfers for certain recurring operating expenditures such as postage expense. Current check volume from this account is approximately fifty checks per week.

Bank of America – Libor Premium Money Market Savings (457003741171) – California

      82.    The Bank of America Libor Premium Money Market Savings Account serves as a vehicle to increase the value of American Counseling's surplus cash. This account is currently inactive with a zero balance. The Debtors' management is analyzing the usefulness of this account and is considering closing the account during 2009.

Bank of America – Merchant (000747561821) – California

83.    The Bank of America Merchant Account is a zero balance account used by American Counseling solely for the distribution of Restitution Payments to large Merchants on a weekly basis. Funds are transferred to this account from the Jurisdiction Accounts. There are approximately fifteen large Merchants paid through this account on a weekly basis.

Bank of America – ACCS General (000747367800) – California

84.    The Bank of America ACCS General Account is referred to by the Debtors as the "ZBA Account." This is a zero balance account previously used by American Counseling to fund the payroll, chargeback, and caps-postage accounts using the zero balance service. As described below, American Counseling's payroll, chargeback, and caps postage accounts are now funded directly from the Bank of America General Checking Account. The ZBA Account continues to serve as American Counseling's source for ACH and wire transfers outside of Bank of America to fund such items as expense reimbursements to employees and management fees. Funding for this account originates from transfers out of the Bank of America General Checking Account. Cash out-flows from this account occur via automatic zero balance transfers.

Bank of America – Payroll (000747940591) – California

85.    The Bank of America Payroll Account is used for the funding of American Counseling's bi-weekly payroll. Every other week, American Counseling's payroll provider (Paychex, Inc.) debits the Bank of America Payroll Account for American Counseling's payroll and related taxes on Thursday and Friday respectively. In addition to the standard bi-weekly payroll expenses, this account is also used to periodically pay for

items such as payroll corrections, advances, and termination pay checks.  The Bank of

America Payroll Account is funded from the Bank of America General Checking Account.

Bank of America – Instant Payments (000747940652) – California

> 86.    The Bank of America Instant Payments Account is used by American
>
> Counseling for receiving electronic payment settlements from Diversion Program
>
> Participants via ACH, credit card (other than Discover), and Western Union.  Settlements
>
> received in this account are transferred to the Jurisdiction Accounts once or twice per week.
>
> Transfers to the Jurisdiction Accounts are completed by the accounting department and
>
> reconciled to the Super System reports.  No other cash out-flow or in-flow activity occurs in
>
> the Bank of America Instant Payment Account.

Bank of America – Chargeback (000747140651) – California

> 87.    The Bank of America Chargeback Account is a zero balance account
>
> used by American Counseling solely for the funding of ACH and credit card fees charged for
>
> the processing of ACH and credit card payments.  These charges are directly related to the
>
> settlements received in the Bank of America Instant Payments Account.  On a weekly basis,
>
> American Counseling transfers funds directly from the Bank of America General Checking
>
> Account to the Chargeback Account to fund these ACH and credit card fees.

Bank of America – Caps-Postage (000747961824) – California

> 88.    The Bank of America Caps-Postage Account is a zero balance account
>
> used by American Counseling solely for the funding of postage expense charged by the
>
> United States Postal Service.  On a weekly basis, the Debtors transfer funds directly from the
>
> Bank of America General Checking Account to fund these expenses.

Bank of America – BIX (000747669275) – California

    89. The Bank of America BIX Account originally served as a vehicle to

increase the value of American Counseling's surplus cash.  This account is currently inactive

with a zero balance.  The Debtors' management is analyzing the usefulness of this account

and is considering closing the account during 2009.

Bank of America – ACCS Corp General (000747961881) – California

    90. The Bank of America ACCS Corp. General Account serves as the

primary source of cash flow for Debtor ACCS Corp.  The primary functions of this account

include sending wire payments to third parties for interest payments and management fees as

they become payable.

Bank of America – SCH Corp General (000747061833) – California

    91. The Bank of America general account for SCH Corp. serves as the

primary source of cash flow for Debtor SCH Corp.  The main functions of this account

include sending wire payments to a third party for management fees.  All transfers to the

SCH Corp. general account are initiated by the accounting supervisor or controller, and are

authorized by the Debtors' CFO and CEO.

Union Bank – Special Deposit Account (0480014847) – California

    92. The Union Bank Special Deposit Account is referred to by the Debtors

as their "Union Bank General Account."  This account historically served as the primary

source of cash flow for the Debtors.  This account receives zero balance transfers from the

Debtors' Union Bank instant payments account related to Participant Payments made through

Discover credit cards.  On a periodic basis, the Debtors transfer the funds in this account to

the applicable Jurisdiction Accounts via the Debtors' general account maintained with Bank

of America.  Due to control agreements with the Debtors' investment group, the Debtors

have left this account open.  As of the Petition Date, the Union Bank General Account is

active with minimal activity.

Union Bank – ZBA Account (0480031318) – California

93.    The Union Bank ZBA account is referred to by the Debtors as the

"Union Bank Instant Payments Account."  This account is used for receiving electronic

payment settlements from Diversion Program Participants via ACH, credit card, and Western

Union wire.  Settlements received in the Instant Payments Account are automatically

transferred to other Operating Accounts on a daily basis using the zero balance transfer

service.  The funds are then transferred to the appropriate Jurisdiction Accounts.  No other

cash out-flow or in-flow activity occurs in the Union Bank Instant Payments Accounts.  As

of the Petition Date, the Union Bank Instant Payments Account has minimal activity.

Dormant Union Bank Accounts

94.    The Debtors also maintains the following dormant accounts with

Union Bank: (i) Union Bank – Special Deposit Account (0480029623) – California

(maintained by American Counseling) ; (ii) Union Bank – Fees Account (0480031296) –

California (maintained by American Counseling); (iii) Union Bank – Liles Settlement

Account (0480035305) – California (maintained by American Counseling); (iv) Union Bank

– ACCS Corp. Special Deposit Account  FBO LLCP (0480029593) – California (maintained

by ACCS Corp.); and (v) Union Bank – SCH Corp. Special Deposit Account  FBO LLCP

(0480029593) – California (maintained by SCH Corp.) (collectively the "Dormant

Accounts"). The Dormant Accounts have zero balances and remain open because they are subject to certain control agreements with the Debtors' lenders. Because these accounts are dormant and unfunded, the Debtors propose to close them.

95.    Maintenance of the forgoing Bank Accounts is absolutely critical to the successful operation of the Debtors' business because it is essential that the prosecutors' offices that have Support Agreements with the Debtors and Merchants who expect Restitution Payments from the Debtors have confidence that funds will not be delayed or misdirected. Any interruption in payment could jeopardize the Debtors' relationships with the prosecutors' offices and shake the confidence of those who rely upon the integrity of the Debtors' procedures. In this regard, as discussed above, the Debtors have developed a seamless method of transferring Restitution Payments owing to Merchants and Administrative Fees owing to prosecutors' offices through the Jurisdiction Accounts. The Jurisdiction Accounts are such a specialized system of cash management that they can be managed only via the Debtors' own proprietary Super System. Disruption of this complex system of over 150 accounts would threaten the timely remittance of Merchant funds and thus the lifeblood of the Debtors' business.

96.    In addition, maintenance of the Bank Accounts will greatly facilitate the Debtors' operations in chapter 11. As discussed above, all electronic payments from the Diversion Plan Participants are deposited into one of the Debtors' Operating Accounts. Electronic transfers account for 70% of the Participant Payments received by the Debtors. If the Operating Accounts were closed, the Debtors would have to open new accounts and then attempt to arrange alternative payment procedures with Participants, which would completely

disrupt the flow of the Debtors' receipt of revenues and the Debtors' payment of debts incurred postpetition. Such a disruption would severely impact and could irreparably harm the Debtors' ability to operate their business.

97.    As noted above, American Counseling's Chairman, Chief Executive Officer, and Chief Operating Officer who are employed by non-Debtor Equity Pacific Advisors, LLC ("EPA") (collectively the "EPA Employees"). The Debtors pay EPA a monthly management fee (the "Management Fee"), equaling the aggregate amount of the EPA Employees' monthly wages. EPA, in turn, uses the Management Fee to pay the monthly wages of the EPA Employees. The monthly Management Fee is approximately $60,800.

98.    Prior to the Petition Date, the Debtors engaged in intercompany financial transactions between and among the Debtors related to the monthly payment of the Management Fee in the ordinary course of the Debtors' business (the "Intercompany Transactions").

**Cash Collateral Motion**

99.    The Debtors have filed a motion for (I) entry of interim and final orders (A) authorizing the use of cash collateral, (B) granting adequate protection to prepetition secured parties and (C) granting related relief, and (II) scheduling a final hearing (the "Cash Collateral Motion").

100.    The Debtors have an immediate need for the use of cash in light of the immediate and irreparable harm that will be suffered by the Debtors' estates if they do not have access to the cash necessary to sustain their business as a going concern. The Debtors have an

urgent need to use cash for, among other things, continuing the operation of their business in an

orderly manner, maintaining business relationships with prosecutors' offices and Merchants,

paying employees, and satisfying other working capital and operational needs -- all of which are

vital to preserving and maintaining the Debtors' going-concern value and, ultimately,

effectuating a successful reorganization for the benefit of all parties in interest.

101.    I believe that the continued operation of the Debtors' business will

preserve the Debtors' going-concern value, enable the Debtors to capitalize on that value through

a reorganization, and ultimately enable the Debtors to confirm a chapter 11 plan.  However, if

the Debtors are not allowed to use Cash Collateral, I believe the Debtors' revenues will decline

and their Debtors' business will deteriorate in value to the detriment of LLCP (as well as all of

their other stakeholders).

**Critical Vendor Motion**

102.    The Debtors have filed a motion (the "Critical Vendor Motion")

authorizing them (i) to pay, in the reasonable exercise of their business judgment and in their

sole discretion, the prepetition fixed, liquidated and undisputed claims (the "Critical Vendor

Claims") of certain critical printers with whom the Debtors continue to do business and whose

dealings are essential to the Debtors' operations (the "Critical Vendors"); and (ii) to allow such

Critical Vendors to apply postpetition payments by the Debtors to unpaid prepetition invoices.

103.    The Debtors estimate that the maximum aggregate amount of Critical

Vendor Claims that may be paid directly pursuant to the Critical Vendor Motion is

approximately $150,000.  The Critical Vendors function as an extension of the Debtors' "back

office" and the Critical Vendors and Debtors routinely exchange electronic information to enable

the Critical Vendors to promptly and correctly send out repayment proposal letters to individuals who are eligible for the Diversion Program.

104.    The Debtors believe that many of their vendors will continue to do business with the Debtors after commencement of these cases because doing so simply makes good business sense.  In some cases, however, the Debtors anticipate that certain vendors, the Critical Vendors, may limit their dealing with the Debtors.

105.    The Debtors' ability to use the printers to process and mail the repayment proposal letters is the cornerstone of their ongoing operations and success, and without such continued ability, the Debtors' business would be significantly harmed.  Payment of Critical Vendor Claims is vital to the Debtors' reorganization efforts because the Critical Vendors process and mail approximately 200,000 repayment proposal letters per month for the Debtors. These letters, sent on behalf of the applicable district attorney, provide the bad check writer with the option to make restitution payments to the injured Merchant and take American Counseling's education seminar in lieu of risking prosecution or other penalties that might be imposed.  Fees paid by individuals who elect to take American Counseling's education seminars are the primary source of revenue for the Debtors.  The Debtors believe that the failure to pay the Critical Vendor Claims may very likely result in the Critical Vendors refusing to print and mail the letters on behalf of the Debtors.  This, in turn, would deprive the Debtors of their only source of revenue.  Because of their long-standing relationships with the Critical Vendors, the Debtors know the printers can adroitly handle the large volume of correspondence sent to bad check writers under the Diversion Programs.  Any breakdown in the prompt dissemination of these

letters will harm the flow of revenue into the Debtors.  The Debtors believe the printers cannot be expeditiously or seamlessly replaced.

106.    In addition, I believe the relief granted by the Critical Vendor Motion would likely avert the filing of suits, liens and motions by Critical Vendors seeking payment of or priority for their claims on a variety of grounds.  Avoiding the time, distraction and considerable expense of litigating the merits of such claims would benefit the Debtors, their estates and creditors while facilitating the orderly administration of these cases.

**Conclusion**

107.    For all of the foregoing reasons, I respectfully request that the Court grant

the relief requested in each of the First Day Motions and applications filed concurrently

herewith.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

is true and correct.

Executed this *19*<sup>*th*</sup> of January 2009 at _____, _____.

AMERICAN CORRECTIVE COUNSELING
SERVICES, INC.

By: _____

Michael L. Wilhelms
Chief Financial Officer

701147.4                                          43