## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------x

| | |
|---|---|
| In re: | :   Chapter 11 |
| | : |
| SCH Corp., et al.,[1] | :   Case No. 09-10198 (BLS) |
| | : |
| Debtors. | :   (Jointly Administered) |
| | : |

-------------------------------------------------------x

**DECLARATION OF MICHAEL SCHRECK, IN OPPOSITION TO MOTION TO DISMISS CHAPTER 11 CASES AND IN SUPPORT MOTION FOR ORDER (I) AUTHORIZING AND APPROVING SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, (II) AUTHORIZING PAYMENT OF THE DEBTORS' LENDER WITH THE CASH PROCEEDS THEREFROM, (III) APPROVING CREDIT BID OR WINNING BID AT THE AUCTION, AS APPROPRIATE, AND (IV) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND FIXING CURE COSTS ASSOCIATED THEREWITH IN CONNECTION WITH THE SALE**

I, Michael Schreck, hereby declare that the following is true to the best of my knowledge, information and belief:

1.    I am the Chief Executive Officer of each of the Debtors. I have served in that capacity since November, 2004. I am also a member of the Board of Directors of each of the Debtors. As Chief Executive Officer I have overall responsibility for the strategic direction of the Debtors and as a member of the Board of Directors I am involved in all significant board-level decision making for the Debtors. Prior to making the decision to file the chapter 11 cases for the Debtors, the Debtors were in serious financial distress. The problems facing the Debtors included the impending foreclosure by Levine Leichtman Capital Partners III, LP ("LLCP"), the

---

[1] The Debtors in these cases are:  SCH Corp.; American Corrective Counseling Services, Inc.; and ACCS Corp.

principal secured creditor of the Debtors, due to various defaults by the Debtors, and the effects

of four (4) pending class actions or putative class action lawsuits alleging violations of the Fair

Debt Collection Practices Act on behalf of persons who were eligible for the bad check diversion

programs administered by the Debtors for various District Attorneys.

2.    More specifically, at the time these chapter 11 cases were filed, the

Debtors were in default to LLCP by reason of certain defaults under financial covenants

contained in the various agreements between the Debtors and LLCP and the failure of the

Debtors to pay default interest to LLCP.  The debt owed to LLCP arose out of LLCP's financing

of the acquisition of the Debtors in 2004 by the current owners.  The original acquisition debt

was approximately $29 million.  By the time LLCP declared the Debtors to be in default in 2008,

the debt was in excess of $32 million due to the PIK interest.  The Debtors' alleged defaults to

LLCP dated back to July 2008 and are asserted in a series of letters from LLCP to the Debtors

dated July 24, 2008, August 12, 2008, September  2, 2008, October 22, 2008, November 3, 2008,

December 2, 2008, and January 5, 2009.  True and correct copies of the foregoing default letters

are collectively attached hereto as Exhibit A.  In addition to the default letters, there were

innumerable discussions between LLCP and the Debtors throughout this period about the

Debtors' deteriorating ability to service its debt and pay its expenses and the Debtors' request to

obtain additional capital from LLCP.

3.    With respect to the class action litigation, in two instances, the class

actions or putative class actions were pending against the Debtors at the time that I and certain

other investors acquired ownership of SCH Corp. (the ultimate parent company) in 2004.  The

other actions were subsequently commenced.  This long-running litigation has been extremely

expensive for the Debtors, particularly after the applicable insurance that had been funding the

costs of defense for three of the lawsuits was exhausted.  In the fourth case -- the one most recently filed in Pennsylvania -- insurance coverage was denied by the carrier.  By the time the Debtors decided to seek protection under chapter 11, the Debtors owed approximately $1 million to the attorneys that had been representing them in the class actions and to various vendors who asserted claims against the Debtors for services rendered on behalf of or through such litigation counsel.

4.    Because of the continuing defaults to LLCP and the Debtor's limited resources, the Debtors attempted to effect an out-of-court restructuring with LLCP that included LLCP obtaining a large equity stake in the Debtors in exchange for LLCP providing the Debtors with additional funds to either continue to fund the defense of the class action lawsuits or settle the class actions, and to fund ongoing operations at more than a sustainable level.

5.    In this regard, in order to attempt to settle the class action litigation, the Debtors conducted two mediation sessions with the class action attorneys in February and October 2008 and one mediation session in May 2006.  None of the mediations resulted in settlement.

6.    With no insurance coverage in place and ever mounting litigation expenses, and given the inability to settle the class action lawsuit on sensible terms, and also based upon declared payment and covenant defaults that dated back six (6) months to July 2008, on January 12, 2009, LLCP advised the Debtors in writing that it was accelerating the indebtedness owed by the Debtors to LLCP.  At that time, even with the disputes over the calculation of interest, the Debtors owed LLCP in excess of $32 million.  In addition, also on January 12, 2009, LLCP scheduled a foreclosure sale of the stock of the Debtors pledged to

-3-

LLCP to occur on January 19, 2009.  True and correct copies of the acceleration notice and the foreclosure notice are attached hereto as Exhibit B and Exhibit C, respectively.

7.    In addition, in order to put further pressure on the Debtors and to enforce its rights, on January 16, 2009, LLCP exercised its rights under various deposit account control agreements and froze those accounts.

8.    Faced with imminent foreclosure by LLCP in a matter of days, the Debtors quickly retained bankruptcy counsel on January 12, 2009, and began preparing to file chapter 11 cases.

9.    Even though the Debtors were faced with pending foreclosure by LLCP, the Debtors made a last ditch effort to attempt to settle with the class action attorneys in the hope that such a settlement would cause LLCP to rescind its foreclosure notice.  Part of these efforts included direct discussions between representatives of LLCP and the class action attorneys on January 19, 2009, the day set for the foreclosure sale.  At least one extension of the time scheduled for the foreclosure sale was granted by LLCP on January 19, 2009, to permit the settlement discussions to continue.

10.    LLCP was a necessary party to any settlement because LLCP would have provided the Debtors with the funds to pay for any settlement.  Despite their best efforts, the Debtors and LLCP were not able to settle with the class action claimants and, consequently, the Debtors were not able to convince LLCP to rescind or further delay the foreclosure sale.

11.    As a result of the foregoing, on January 19, 2009, the Debtors commenced these chapter 11 cases.

12.    Although the immediate triggering event that caused the chapter 11 filings was the Debtors' need to use section 362(a) to stay the foreclosure sale by LLCP, the

-4-

deteriorating financial condition of the Debtors was also a key component of the decision to seek

protection under chapter 11. The continuing cash drain and distraction of management caused

by the litigation, the inability to pay debt service to LLCP and to also pay defense costs and

operating expenses, the mounting arrearages to defense counsel, and the absence of insurance to

pay ongoing defense costs, were all contributing factors to the decision to file the chapter 11

cases.

13.    With respect to the allegations made against the Debtors by the class

action lawyers that chapter 11 filings were done with the intention to undertake a "quick" sale to

LLCP, even though I am informed that early case section 363 sales are not unusual in chapter 11,

these particular cases were not filed with the intent to seek a quick sale. As set forth in the term

sheet for superpriority financing (Exhibit D, attached) provided to the Debtors by LLCP prior to

the commencement of the chapter 11 cases ("the Prepetition Term Sheet"), LLCP contemplated a

plan of reorganization rather than a section 363 sale.

14.    Indeed, as set forth in the Prepetition Term Sheet, prior to the date the

chapter 11 cases were filed, the Debtors engaged in brief negotiations with LLCP over the terms

of possible debtor in possession financing. The Debtors did not accept LLCP's proposed terms

because they felt that the terms were onerous and unfair and that the Debtors could operate their

business without additional borrowing so long as the Debtors were freed of ongoing litigation

expenses and were not required to pay interest to LLCP during the chapter 11 cases. The

Debtors' rejection of the Prepetition Term Sheet is attached hereto as Exhibit E.

15.    However, following a contested cash collateral hearing on February 3,

2009, where the Debtors obtained limited use of cash collateral for an interim period, at the

urging of the Bankruptcy Court (which had indicated at the hearing that the Debtors would

#10729824 v1

probably have to commence making interest payments to LLCP), the Debtors undertook

discussions with LLCP about the consensual use of cash collateral and possible debtor in

possession financing.

16.     It was only in connection with the Debtors' post-petition negotiations with

LLCP that the subject of a 363 sale first arose.  Nevertheless, as set forth in the Cash Collateral

Stipulation and the DIP Loan Terms Agreement (copies of which are attached hereto as Exhibits

F and G, respectively), the Debtors and LLCP did not agree to a sale process to the exclusion of

a plan of reorganization, but instead contemplated a dual track approach where the parties would

concurrently undertake a 363 sale process and attempt to negotiate a plan of reorganization.  If a

plan was agreed upon, the sale process would be delayed to enable the parties to seek to confirm

a plan, and the sale would, in those circumstances, be a back-up alternative to a plan of

reorganization.  Unfortunately, because of the aggressive litigation activities of the class action

claimants in these chapter 11 cases, the professional fees of the Debtors began to mount beyond

the point where the Debtors and LLCP believed the continued operation of the cases could

sustain ongoing professional fees, ongoing payment of interest, and payment of operating

expenses.  For this reason, the Debtors and LLCP decided to focus on the 363 sale rather than

development of a plan of reorganization.  The prompt sale will reduce accruing professional fees,

eliminate operating expenses, and halt interest payments, which greatly decreases the risk of

administrative insolvency in these cases.  Moreover, the Debtors were concerned that the District

Attorneys were increasingly uncomfortable that American Corrective Counseling, Inc., the party

on whom they relied to administer their bad check diversion programs, was potentially deeply

mired in chapter 11.  Because virtually all of American Corrective's Support Agreements with

the District Attorneys permit termination by the District Attorney for convenience, and because

the District Attorneys became more uncomfortable with the unsettled situation of these cases the longer the Debtors remained in chapter 11, the longer the Debtors remained in chapter 11 without a prompt resolution, the greater the likelihood that the District Attorneys would lose patience and seek to terminate their contracts with the Debtors. Indeed, at least five (5) District Attorneys have tried to give notice of cancellation thus far in the cases. The stability of the Debtor's customer base therefore compelled the Debtors to go along with the sale milestones embedded by LLCP in the Cash Collateral Stipulation.

17.    In order to pursue a sale in the best manner possible, the Debtors solicited proposals from several investment bankers, including William A. Blair and Company ("Blair"). The Debtors were interested in using Blair because the Debtors had used Blair in an earlier process and Blair was already familiar with the Debtors' operations and finances as well as with the identity of persons who might be interested in purchasing the Debtors. Given the milestones in the Cash Collateral Stipulation, the Debtors felt that it was important to move ahead with an investment banker that needed no time to become familiar (or in the case of Blair, re-familiar) with the Debtors.

18.    Blair ran a fulsome sale process and contacted 261 potential purchasers. As a result of these contacts, 71 persons signed confidentiality agreements and 26 persons conducted due diligence. In addition to LLCP, the Debtor believes that once qualifications are proven, there will be at least one other qualified bidder to bid against LLCP at the Auction to be held on March 30, 2009.

19.    With respect to the sale of substantially all of the Debtors' assets to LLCP or another qualified bidder, there are no side-deals or undisclosed agreements between the Debtors and/or any members of senior management of the Debtors, on the one hand, and LLCP

-7-

or any other potential purchaser, on the other hand. All negotiations have been conducted at arm's length and the Debtors believe that they have obtained the highest and best price possible under the circumstances of these cases. All arrangements or potential arrangements between the Debtors and/or any members of senior management of the Debtors, on the one hand, and LLCP or any other another potential purchaser, on the other hand, have been disclosed to the Court. There have been discussions between LLCP and members of senior management of the Debtors about post-sale employment for Michael Schreck, Brett Stohlton and Mike Wilhelms. Although no agreements have been reached to date, the most current term sheets exchanged by the parties are attached hereto as <u>Exhibit H</u>. Updates of any discussions will be filed with the Court in advance of the sale hearing. Any agreements will be fully disclosed as well.

20.    The sale process in general and the asset purchase agreement signed by the Debtors in particular are the result of the exercise by the Debtors of their business judgment under the circumstances of these cases.

21.    The Debtors did not file these chapter 11 cases in bad faith or for an improper purpose. Regardless of the merit or lack of merit of the class action lawsuits, and regardless of whether the plaintiffs in the class actions can ever prove any violations of law by the Debtors, the Debtors had a proper reorganization purpose in filing these cases and later in seeking to sell their assets. The Debtors were in financial distress based upon a confluence of factors and events facing them. The Debtors were not just in covenant default to LLCP, but they were in payment default as well. The Debtors could not meet all of their obligations -- debt service, taxes, operating expenses, and counsel fees -- as they came due. The chapter 11 cases stopped an imminent foreclosure by a secured creditor owed in excess of $32 million, provided a respite from the distraction of relentless litigation and the effect of unpaid and ever increasing

litigation counsel fees, enabled the Debtors to stabilize their business, reduce interest expense by

decelerating LLCP's debt, and, through the proposed sale, preserve jobs for their employees, a

customer for their vendors, and a service provider for the District Attorneys.  At the time it filed

these cases, the Debtors intended to pursue a plan of reorganization and not a prompt section 363

sale.  At all times, whether prepetition or postpetition, the Debtors intended to seek to confirm a

plan of rehabilitation or liquidation or to pursue a section 363 sale, which I understand to be

permissible goals in chapter 11.

       Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 25 of March 2009 at San Clemente , CA                    .

           SCH CORP.
           ACCS CORP.
           AMERICAN CORRECTIVE COUNSELING
           SERVICES, INC.

           By: _____
             Michael Schreck
             Chief Executive Officer